## LIKINS v. LIKINS, *Appellant.*

### Division One, May 28, 1894.

1. **Equity Practice:** REVIEW OF FACTS. The facts are open to review on appeal in equity cases.

2. ——: ——: UNDUE INFLUENCE. The facts and circumstances of a transfer of land by an old and feeble father to a son with whom he lived discussed, and the transaction *held* valid and free from undue influence.

*Appeal from Lawrence Circuit Court.*

REVERSED AND REMANDED.

*R. H. Landrum* and *Henry Brumback* for appellant.

The court erred in rendering a decree for plaintiff upon the evidence. Under the facts and law applicable thereto, plaintiff did not make out a case of undue influence. *Norton v. Paxton*, 110 Mo. 465; *Couch v. Gentry*, 113 Mo. 255; *Gay v. Gillilan*, 92 Mo. 256; *Brinkman v. Rueggesick*, 71 Mo. 556; *Jackson v. Hardin*, 83 Mo. 180.

*N. Gibbs* for respondent.

(1) The evidence clearly shows that confidential relations existed between W. G. Likins and Gravener Likins, his father; that the father was the weaker and the son the stronger. The father called the son his guardian. *Caspari v. Church*, 12 Mo. App. 293, *loc. cit.* 314;

*Gay v. Gillilan*, 92 Mo. 250, *loc. cit.* 262; *Hall v. Knappenberger*, 97 Mo. 509, *loc. cit.* 511. (2) "Transactions of this kind taking place between parent and child, guardian and ward, are watched by courts with the most scrutinizing jealousy, and generally held to be presumptively void." *Garvin v. Williams*, 44 Mo. 465, *loc. cit.* 469; 12 Mo. App. *supra.* (3) "Every presumption is against them (such gifts)." *Yosti v. Laughran*, 49 Mo. 594; 12 Mo. App. *supra.* (4) "The rule on this point is of universal recognition and finds application commensurate with the existence of confidential relations.  *  * There exists, therefore, no necessity to show fraud or imposition practiced upon him who bestows the confidence; but simply to show that, during the pendency of such intimate relations, the conveyance in question was made." *Street v. Goss*, 62 Mo. 226; 12 Mo. App. *supra.* The burden then shifts to the recipient to uphold its fairness. *Gay v. Gillilan*, 92 Mo. 250. (5) The defendant did not show that his father had competent and independent advice as to this matter. Judge Story says that, "It is incumbent upon persons, who receive benefits from those towards whom they stand in confidential relations, to show that such persons had competent and independent advice." 1 Story's Eq. Jur. 312; *Ford v. Hennessey*, 70 Mo. 580; 12 Mo. App. *supra.* (6) If two facts concur, viz: Inadequacy of consideration coupled with mental imbecility, although the weakness of mind does not amount to idiocy or legal incapacity, the contract or deed will be annulled at the instance of the proper party. *Cadwallader v. West*, 48 Mo. 483; *Kroenung v. Goehri*, 112 Mo. 641. (7) Appellants claim that the deed was testamentary in its scope and should be considered as such. This can not be done, and this court has clearly drawn the line, "A deed can not be made to perform the functions of a will." *Sneathen v. Sneathen*, 104 Mo. 201; *Allen v.*

*DeGroodt*, 105 Mo. 442.    Appellant's construction would indeed "be the court making wills for other people." *Maddox v. Maddox*, 114 Mo. 35; *Brinkman v. Rueggesick*, 71 Mo. 556.

BARCLAY, J.—This is a suit to set aside a deed by Gravener Likins to William G. Likins, his son, the defendant. Plaintiff is another son of the grantor. The grounds of the suit are incapacity on the part of the grantor, and undue influence on the part of the grantee; both of which are disputed.

The trial court found for the plaintiff and set aside the deed. From that decree the defendant has appealed.

The case being on the equity side of the court, the facts are open to review here, and have been duly considered.

The deed in question bears date, December 3, 1885. At that time old Mr. Likins was about eighty-one years of age. He had been a hard drinker during his earlier years; his eyes were weak; he was hard of hearing, feeble, and often childish. He frequently used a cane in walking.

In 1881 his son George, the plaintiff, lived on his father's farm; and the rents of the latter were sufficient to supply the wants of the old man. While George was away, during that year, his brother, the defendant (known in the family by the nickname "Weet"), rented the farm of his father, and agreed to care for him and pay $50 yearly, as rent. When George returned, he first learned of that arrangement, and then moved away, leaving his father and brother William at the home place.

Defendant occupied and cultivated the farm under his contract until 1885, when the deed in controversy was executed. It conveyed one hundred and sixty

acres of land, worth about $3,200. It recited a consideration of $1,000; but it was admitted by the answer that no money was paid for the transfer.

The deed conveyed all the property of old Mr. Likins, except eighty acres of timber land, worth about $400.

He had another son, David, besides the two already named.

The father had previously given a tract of eighty acres to David and a like tract to George; but, before the deed in question, he had given no land to William.

After William came to the home farm, he looked after the old man, and after the latter's business. The utmost confidence existed between the two, and the old man occasionally referred to his son as "his guardian." The father had been a reader of books, and often quoted from the Bible and Josephus.

In his latter days he would sometimes wander from the subjects of ordinary conversation to these favorite scriptures, and interlard his talk with quotations from them, not always apposite to the topic in hand.

He died in 1888, and this suit was brought in 1890. The deed in dispute was drawn by Mr. Wilkerson, justice of the peace of Ozark township, who lived near by. It conveyed the one hundred and sixty acres to defendant, reserving a life estate to the grantor. Mr. Wilkerson also took the acknowledgment. He was a witness at the trial on the part of plaintiff, and upon cross-examination gave a very clear account of the circumstances of the execution of the instrument. His account was contradicted by no one. We insert it as found in the record, for we consider it the decisive testimony on the main issue of the case:

"Q. Go on and state all about that transaction, how you came to make the deed, and what was said by

Gravener Likins or William G. Likins in your pres-
ence.  *A.* Well, sir, I went up there in the morning.
The afternoon before, William G. Likins came to my
house and said he wanted me to come to his house and
make a deed to three or four acres of land for him to
set his house on; that his father had agreed to deed
him a bit of land there, so he could build a new house,
so that he would not lose his house.  I said, I will be
up there in the morning.  I will come early and attend
to that, and will be in a hurry and you have every-
thing ready.  When morning came, I went up there
and went in the house and Uncle Gravener was sitting
there in his chair, and, when I went in, there was a
couple of other young men there and some ladies, the
family and some others.  There was one man, Colonel
Boone they called him.  I don't remember the other
names.  Wm. G. Likins told his father that I had
come to attend to that business.  Uncle Gravener
appeared to be bothered for a little bit and commenced
talking in his usual mode of talking.  I had stated
that matter over, and, addressing himself to William
and me, he says: 'I don't like that plan.  In deeding
this amount of land will take my house where we sit,
and I have always heard it a very good idea for old
folks to take care of themselves.  We need a new
house, but if I was to deed him this land, I can not
get it in any shape but what it would take the house.'
He says: 'Can you make a deed that it will be mine as
long as I live and then his when I die?'  I says: 'I
don't know.  I will do the best I can.'  He then made
this remark, he says: 'I have one hundred and sixty
acres of land here that I aim for him to have.'  He
said then that he would make this one hundred and
sixty acres to W. G. Likins; that he had given George
and David Likins eighty acres apiece before that, and
he says: 'I have another eighty that I would give to

George, but I gave him one eighty and he did not keep it. I will make this one hundred and sixty to William. One eighty is due him, and the other eighty—he has got to take care of me the balance of my lifetime and I will deed him the one hundred and sixty acres of land.' I says: 'Do you know the numbers?' He says: 'Yes, sir,' and told me how it laid; that one eighty laid east and west, and the other north and south, and through him and W. G. Likins together, the question was—he says: 'How would that suit you, Weet?' Weet says, 'Dad,' (I believe they called him Dad) 'anything to save my house. I want to build a house four or five or six hundred dollars. Anything will satisfy me so I do not lose my house in the end.' Then Gravener says to me, 'You can make the deed and, if I think it will do—if it will be my land as long as I live, it will do.' This young man, Boone, was sitting in the house all the time, and I don't recollect whether the other young man was there all the time. After I got the deed ready and read it to Uncle Gravener—after he made the statement to him, 'anything to save his house would satisfy him,' Gravener then said to make the deed, and I made it, and read it to him. He said I would have to sign his name, that he could not write his name. He was a nervous man so he could not write his name; I wrote his name. This man Boone, I called him to witness the mark, and I delivered over the deed to 'Weet' Likins.

"*Q.* You handed the deed to Weet Likins? *A.* I don't know whether I handed it to him. They was all there together.

"*Q.* You read it over to Gravener? *A.* Yes, sir.

"*Q.* Did he appear to understand it? *A.* Yes, sir; he appeared to understand it.

"*Q.* Did he say anything? What did he say? *A.* I don't recollect just what he said, but he gave his con-

Likins v. Likins.

sent in that way; he just said 'all right,' to write his name—'write my name and I will make my mark.'

"*Q.* You say he had been nervous for how long? *A.* I have known him for twenty-two years and he was that way when I first knew him.

"*Q.* How long did he live after that? *A.* That was in 1865.

"*Q.* You mean 1885, do you not? *A.* Yes, sir, and he died this last spring a year ago.

"*Q.* You mean two years ago, do you not? *A.* Yes, sir; in 1888 he died.

"*Q.* You said you got the numbers of the land, the description, in what way? *A.* From him and Weet there together, and I knew something about the numbers myself and how the land laid.

"*Q.* Without reference to any written memorandum at all? *A.* Yes, sir, without any memorandum. If I am not mistaken, he quoted the numbers. He commenced and talked about the numbers and the two together gave me the numbers of the land.

"*Q.* What was the condition of his mind that day? *A.* Well, sir, as far as I have been acquainted with the old gentleman—of course when I first knew him he was stouter physically. He had mind enough to say that he wanted to take care of himself. Of course, he was older and weaker and talked weaker. It was the same as any other old man.

"*Q.* Did he fully understand what he was doing? *A.* I thought he did, or I would not have made the deed.

"*Q.* You have been acquainted with the old man twenty-two years? *A.* Yes, sir, twenty-two years.

"*Q.* What character of man was he as to mind? *A.* I never heard anything but he was a man of ordinary mind.

"*Q.* What kind of man was he as to memory of events? *A.* Well, sir, his great pride, outside of talk-

ing of his own business, was to talk scripture and history. And he was very well read in regard to those matters, and would talk considerably about matters he had read in his younger days.

"*Q.* What was the manner of his conversation as to whether it was connected and intelligent? *A.* He was considered, so far as I know, a very intelligent man. He was economical and saving, and I used to hear him complain about his boys not being saving."

There was considerable testimony for plaintiff tending to show that old Mr. Likins was feeble in mind when the deed was given; and abundant testimony to the effect that he had fair business capacity at that time.

No good would be done by a review of the evidence in detail. We have all given it due consideration. We conclude from it that, although the old man was weak in body, he fully understood the transaction now under review, and did his part in it freely and intelligently. The scene described by the justice gives a very correct impression of the old man, confirmed by much of the other evidence. He exhibited many infirmities of age, and many of its eccentricities, but, with all, was no man's tool or puppet.

One venerable neighbor, who had known him thirty years, gave a quaint and just estimate of him, when asked as to "his business sense," by the reply that he had as much of it as any of his boys; "he knowed more the worth of a dollar than all three of his boys put together."

Certainly the facts attending the execution of the instrument do not tend to establish any want of business capacity or understanding on the part of the principal figure in the transaction, or any attempt at undue influence or overreaching on the part of the plaintiff.

Considering the father's prior gift of an eighty

acre tract to each of his other sons, there was nothing unjust in his giving William eighty acres. And in view of the proposed improvement of the property (afterwards made by William) for the benefit and comfort of his father and himself, and of the understanding that the former was to be cared for during the residue of his days, the gift of the other eighty acres was not an extraordinary or unreasonable performance. It was one which the father had the right to indulge in, if his act was free and intelligent. We think it was.

We consider that the testimony sustains the gift as the voluntary act and deed of the grantor.

The learned trial judge was in error, we believe, in pronouncing a different conclusion in the decree of the circuit court; and accordingly it is now reversed, and the cause remanded with directions to dismiss the petition at the costs of plaintiff. BLACK, C. J., and BRACE and MACFARLANE, JJ., concur.